to move to the next case on the calendar. That is the Securities and Exchange Commission versus Rashid. Let me make sure counsel is here. Ms. Halligan. Yes, Your Honor. Okay. And Mr. Shirey. Here. There you are. Okay, great. Okay, Ms. Halligan, you have reserved two minutes for rebuttal. So the floor is yours for eight minutes out of the gate. Thank you, Your Honor. Good morning, Judge Sullivan and may it please the court, Caitlin Halligan on behalf of Mr. Ali Rashid, who is here with me today, although I don't think you can see him on the camera. In the course of investigating Apollo, a multibillion dollar private equity firm for violating the Investment Advisors Act, the SEC found that Apollo had not adequately implemented its policies on employee expense reimbursement. Those policies along with Apollo's client investors said that Apollo, not the investors, would pay administrative expenses associated with developing and monitoring client investments. Mr. Rashid improperly sought reimbursement from Apollo for personal expenses. He admitted that was a mistake, that he is, quote, ashamed and that he will carry it with him and he has faced hefty consequences. He repaid all of the expenses plus a million dollars to Apollo to pay for the cost of its investigation, lost his job in 2014, and has not been able to work as an investment advisor since then. But as the district court found, Mr. Rashid did not know that these administrative expenses would be passed through to the client funds like virtually everyone else at Apollo. That is why the district court dismissed the SEC's charge that Mr. Rashid violated Section 206-1. The court's decision that he nonetheless violated 206-2 rests on two separate legal errors, each of which warrant reversal. First of all, the district court made no finding that the amounts paid by the funds were material, which is necessary to find liability, as the SEC conceded. And the record cannot support a finding of materiality because the amount at issue is vanishingly small compared with any relevant benchmark. I want to explore that with you. So because if the denominator is really big, then you can steal a couple of hundred thousand dollars because it's a small percentage. I mean, it's the argument would be that investors wouldn't care that 200 grand or so of their multi-billion dollar fund is being diverted improperly. So two responses to that, Your Honor. First of all, what the SEC has asked this court to look at and what I think Your Honor's question suggests is what do you do with respect to materiality when a defendant knows that the funds he is taking belong to the client? And the two cases that the SEC relies on, Penn and Local 649, are cases where there is no question, but that the defendant there knows that the funds are coming from the client investor. Here, the district court found that the SEC did not prove. That actually is a different problem that you're going to get to anyway under 206 as for the district court's ruling. You said that materiality is an independent failure of the rule. And that seems to rest on the contention that a couple of hundred thousand dollars doesn't matter much to high rollers like your client's investors. And I would think investors, every penny that was diverted to pay expenses would be money that would otherwise be invested to the benefit of the fund, right? First of all, there is no proof that the SEC offered that the investors here actually would have shared the view that Your Honor is suggesting. But Your Honor's view would simply eliminate the requirement of materiality in 2062 cases. What Your Honor's suggesting is that no matter how small the amount that any misappropriation, even unknowing, would be sufficient. And there are not necessarily. I mean, it seems to me that it's basically just saying what it's hundreds of thousands of dollars. That's pretty clear on the other side of the line. If it's 100 bucks, then maybe we've got something to talk about. Your Honor, we have scoured the landscape and I assume the SEC has as well. And we have found no cases out there under any federal security statute, including the Investment Advisors Act, which suggests that the question of the impact on the financial value of an investment is irrelevant. And that makes sense because the purpose of 206 and the Investment Advisors Act more broadly is to ensure that there are not conflicts of interest that taint the investors' recommendations, because that will lead to advice that is based on what puts money in the pocket of the advisor, not the investor. There is no suggestion here that any recommendation that was made had any effect, was affected in any way by this pass through of expenses, which as the court found, the SEC did not show Mr. Rashid knew would go the funds. And in fact, Your Honor, that would have been impossible to prove because the agreements that were in place with the investors, the employee policies and the testimony of everyone in a similar role to Mr. Rashid was that they thought the expenses were being paid by Apollo and not the funds. And so if Your Honor's question is, is any misappropriation, no matter how small relative to the amount of assets under management or any other benchmark, the fees here that were charged by Apollo to the funds or the returns, I don't think there is any support for that in the case law. And I think that would be breaking very new ground. It would basically be saying any misappropriation is per se grounds for liability. All right. Will you turn me into a straw? Excuse me. I just have a question. Why would it depend on the amount of the relative amounts, comparative amounts, if in fact the investment advisor is engaging in acts of disrepute, whatever it is, you know, sexual harassment or in this case, pilfering money from his employer, leaving aside the whole question of knowledge about the funds. Why isn't that relevant to an investor who is relying upon this investment advisor on an ongoing basis to give him the best possible advice? Why isn't it relevant that the person is seen as disreputable or dishonest? Your Honor, I don't think there's any support either in the investment advisors act is supposed to police good behavior by advisors. The question is, are there conflicts of interest? So the mine run of cases, for example, the acceleration of monitoring fees that Apollo engaged in here or front running investments, those kinds of things, that's what the investment advisors act is concerned with. There are no cases that we have seen, nor that the SEC sites, which suggests that something like sexual harassment would be cognizable under the statute. And the DC circuit, I think, put it well in Stedman. No, I'm not saying it's cognizable under the statute. All I'm saying is why isn't what he did material in that sense that it wholly, wholly beyond the impact on the funds. Just the fact that he was engaged in all of this activity. Um, what you're saying, the investment advisory act has no bearing on whether or not he's, he's a person of utter disrepute. He's been concealing criminal activity. He's been doing a lots of different things. None of that matters. Your Honor. First of all, if I may, I see my time has run, but if I may respond, you may, I may, there's some other points that, uh, I think you want to cover and I know I want you to cover. So we'll probably go past the deadline here a bit. So go ahead. Thank you, Your Honor. So judge Walker, first of all, the SEC itself in grass suggested that, uh, the SAP 99 standard, which of course looks at quantitative in addition to qualitative factors is the relevant touchstone. And now it's trying to walk away from that and say that if there is any misappropriation, then that is sufficient to find that there is a cognizable conflict of interest. Your Honor, there is no case law support for the suggestion that some bad behavior that does not affect the investment recommendation is cognizable under the investment advisors act and the SEC can't point to any. And so you're on a respectfully judge Walker. I think that, that, that theory, which is that any act of, uh, misconduct is sufficient for purposes of two Oh six, two for materiality would dramatically expand the scope of the statute without any basis in what Congress was intending to get at. There are no cases we've or other security statutes that bad behavior completely divorced from the financial impact, which there's no dispute is minuscule is sufficient in order to impose liability. Um, Judge Sullivan, I don't know if you have any questions specifically for me, but, but if I can, I would like to touch briefly on the negligence question here. Right. Well, you said that there one of them was materiality. And I think you said there were two others, right? And the second your honor is, is the negligence finding here and what judge Castile said here. And I'd like to quote, uh, this is from page 46, paragraph one 29. He said that Mr. Rashid had the ability to ensure by drilling down within Apollo, that none of the false business expenses were paid by the funds. First of all, there is no basis for imposing that heightened application because Mr. Rashid was no better situated than anyone else at Apollo to know that the accounts receivable department was passing expenses along to the funds. And in fact, the court found that the practices of passing them along were seemingly unknown to Apollo's employees. The agreement said that Apollo paid the reimbursement was paid first by Apollo and the sec itself acknowledges that in its brief and Mr. Rashid, when he immediately reimbursed all of the expenses wrote out a check to Apollo. So he was no better able than anyone else to uncover what it took Paul Weiss and BDO and a many month investigation was that in fact, Apollo was breaching its agreements and its employee policies. And in any event, even if there was some heightened obligation requiring him to do what it took such an effort to uncover is too high a burden to impose, which is why his finding is wrong as a matter of law. But I don't know that the suggestion was that he had to do his own Paul Weiss style investigation. It was that he had to basically take a look to make sure that the fund wasn't paying certain expenses. I mean, that wouldn't have required a Paul Weiss style investigation, right? He was the manager of the fund, right? I don't, I don't think that that's what, what the court held your honor. What the court said is that he had the ability to ensure that none of the funds, none of the expenses were being paid by the funds. And what that would have required is for him to appreciate that that was a possibility and to uncover that in fact accounts receivable, these couple of folks were passing those expenses along. And that is something that would have required apparently a very substantial investigation, especially in light of all of the evidence directly to the contrary that Apollo was paying those fees. Isn't your point more that whatever ability he may have had is beside the point. It's whether he had a duty to investigate under these circumstances. What was the question in is what's reasonably foreseeable. And here, if he'd done an investigation, even, even if he had some duty to investigate, he would have uncovered the agreements that existed that prohibited what Apollo was doing. So, so, so, and, and somehow he was supposed, and the fact that the bookkeeping department of Apollo was deceiving the rest of Apollo would, would, would, would, that would, that would, it would seem to me, unless, unless he's somehow under a duty to suspect fraud by his own company, even though there's no indication of it, you know, ostensible indication of it. That's exactly right, your honor. And that's why the risk was not foreseeable and could not have been anticipated any better by Mr. Rashid than anyone else. And so whether you think about it in terms of what the foreseeable risk is or what the appropriate response by Mr. Rashid was, that's right. Well, you have two other, two other aspects to that. Could it, could it, what is the proximate cause of the fund's harm? And then secondly, was it, was the fraud by the fund an intervening cause, fraud by Apollo an intervening cause? So, so negligence, is it, is it, I'm, I'm, I'm, I think I'm preaching to the choir here, but negligence is a tough, is a tough road to hoe here. I think that's exactly right. And we make those two arguments that your honor identified in our brief as well. And, and the SEC in responding, you know, just as it glosses by the question of, of whether the quantitative factor here matters, simply says, well, they're just talking about proximate cause and intervening actors. That's not true. But in any event, either of those reasons are exactly why the finding of negligence was not warranted here. And look, my, my sense, your honor, is that this case was essentially tried as a 2061 case. But what the SEC focused its attention on a trial was whether or not Mr. Rashid knew that the funds would be billed for these expenses. And the court found that the SEC did not meet that burden of proof. And then nonetheless found that there was negligence without sufficient evidence and certainly significant errors of law. Well, it does seem that he was placing a higher obligation on Rashid by virtue of Rashid's misappropriations, admittedly misappropriations from Apollo. And that I, you know, I'm not sure how you get there. But I think that's correct, your honor. And, and I think the problem with that is, as I said, first of all, I don't think there is a basis in the evidence to conclude that Mr. Rashid would have been any better able to foresee that risk or ferret out that this secret scheme was going on. And in addition, Apollo's actions in flagrant violation of its own contracts with the investors and its own written policies, certainly were an intervening cause that make it impossible to find proximate cause here. Can I ask you a question, though, there's a record question, really, I mean, so Mr. Rashid was a partner at the firm, and he's responsible for managing these funds. And does, and so that includes according to, I think what's undisputed in the record, that he's got to monitor and implement plans to enhance the performance of those portfolio companies in which the funds are invested. Does he not have access to what's going out as expenses? No, your honor, I don't think there's anything in the record, which which suggests that what Mr. Rashid was doing was managing the portfolio companies, which were the corporations that the funds had invested in and taken some significant ownership in. And so his job was to make sure that those companies were functioning effectively. He did not have visibility into the expense reimbursement process and in fact, the two witnesses that the SEC put on, who were also in similar positions at Apollo said that they too assumed that Apollo was paying for these expenses. And so, and the district court found specifically that no one outside of the accounts receivables department, which I believe was a couple of people knew that these practices were going on. So, so no, your honor, he did not have visibility into that, nor did his, his colleagues. I see I am way over my time. If I could just return for one moment to what we started with Judge Sullivan. I understand the court's concern that there was misappropriation that took place here. And Mr. Rashid has acknowledged that that was a mistake, but the district court found he, SEC didn't prove he knew it was coming from the funds. And so to say that that misconduct with no consideration of what is indisputably a teeny tiny minuscule amount of the money at stake in the investments, I think would be completely new ground. And we ask that the court not take that step with 2062 here. Let me just, can I just respond to me? And so you're saying that if they had called a witness, somebody, an investor said, would you care that several a hundred thousand dollars were improperly expensed by someone who willfully misled the company by saying that restaurants and haircuts were related to the management of the fund. Would you care about that? And if they said, yes, materiality has been met. I think that would be a closer question, but your honor, if you look at cases like ECA, for example, which, which judge Keir signed on to ECA says, and this isn't a 10 B case, but, but the reasoning is equally relevant here that if there's less than 2% of assets at stake, that that might be immaterial as a matter of law. And so, yes, I think that would weigh in the balance. Yes. I think it would make it a closer call. The SEC didn't attempt to do that, but I think that still the fact that you were talking about numbers that are in the thousands, hundreds of thousands of a percentile means that those qualitative factors could not overcome the fact that it is so minuscule, but in any event, there is not such testimony in the record. Okay. Well, you've reserved some time for rebuttal, which we'll let you have, even though you went 11 minutes over. Thank you, your honor. And thank you. We had questions. We had questions. So that, look, we, we do that sometimes. Okay. So Mr. Shirey, you need extra time. We'll give you some time too, but why don't you start up and maybe address some of the points that have been raised by the panel and by Ms. Halligan. Will do your honor, William Shirey for the Securities and Exchange Commission. I'd like begin with sort of merging together your point, Judge Sullivan and Judge Walker's set of questions about negligence. And first I'd like to point out in terms of the record, I'd like to identify page A64 of the appendix that the appellant submitted. And on page A64, their own expert concedes during testimony that anyone in Rashid's position had a, it was reasonably foreseeable to that individual. It should have been reasonably foreseeable to that individual that by attributing expenses to their work for a client, that that would and could, or could be billed to the client. With respect to Judge Walker's question about the difficulty of negligence here, I don't actually think there is. And here's the reason. And it goes back to the factual record, the factual findings, which are not disputed on appeal. And that critical factual finding is Rashid did not know anything. He was, he did not know anything about the expense process. He had no reasonable basis to believe that they wouldn't be, as his expert suggested, billed to the client. And that is the antithesis of what a fiduciary must do. This isn't an arm's length relationship. This is someone who has, according to the Supreme Court- Your position then is that he would have been far better off in terms of knowledge had he done enough investigation to go into the, to find the contracts between the funds and the, between the portfolio companies and the funds. Where Apollo was bound to pay, was not permitted to pass the expenses through. Once, if he'd done that, then you'd say, okay, then he's got a pretty good case. But if he'd done a little bit of investigation or that much of the investigation, he'd be off the hook. But because he didn't even do that, somehow he's, somehow he's liable. Your Honor, on the point about would he be in a better position? I think we'd have a different case and he would have better arguments. Here, again, his obligations are framed by the fiduciary standard as set forth in capital gains. He had a didn't do anything. He, well, he actually, that's not true. He did a lot of bad stuff. First of all, not only does he falsify the expenses, but he decides to, according to the district court, hide his theft. And that's the words of the district court, hide his theft by attributing him to work he's doing for his client. His own expert then says, based on that, and based on the set of knowledge that he had there, that made it reasonably foreseeable to him that the funds could be expensed. And Your Honor, Your Honor is exactly right about would he be potentially in a better position? Yes, because negligence is assessed and reasonable foreseeability, the proximate call standard, is assessed based on the universe of knowledge that the person has at the time they act. And at the time he acted, he had, as he conceded during the trial and during deposition, he, he didn't have any particular, anything beyond passing general familiarity with the agreement. Why was his position any different from any other executive at Apollo in terms of trying to ascertain what was going on? This was a fraud that was committed against Apollo, um, or secretly by, by the, by the accounts receivable department of Apollo. And nobody was aware of it. Uh, and so, uh, why, how is it reasonably foreseeable that Apollo is going to be violating all of these contracts? So Your Honor, first of all, can I just, just start talking about executives as well? I mean, you know, this was, this was, it took Paul Weiss investigation to uncover this fraud. Uh, I'm backing up for a second. I know that the, uh, the opposing council, uh, has said that, that Apollo engaged in fraud and I'm not here to defend Apollo, but I want to be clear that the commission did not charge Apollo at any point, did not settle with Apollo, um, for having, uh, violated the terms of their agreements and the district court itself, I believe says it appears that they did, but there's no, there's no definitive conclusion. Correct me. I thought there was sanctions or some sort of major judgment of $50 million that was paid by Apollo. Correct me. Tell me about that. Uh, yes, there were, there were three, uh, there were three findings. Two of those findings have nothing to do with this. And the third finding was a failure to, uh, properly supervise Rashid. Remember Mr. Rashid was caught once, then he was called a second time by Apollo. And, uh, I'm talking about the, wasn't there a recovery of the funds, uh, from the funds or some, somehow there was, uh, Apollo was held to account in a major way after the, uh, after the Paul Weiss investigation. Well, my recollection is there was a case, but that it did not, uh, center on whether or not Apollo had, uh, breached their, uh, agreements here, but, but be that as it may, um, to your question, your honor, I think the answer to why, uh, Rashid might be differently situated, um, than other, uh, actors or executives that Apollo is, uh, including those who testified for the commission is that as the district court said, Rashid is the Rashid, unlike those individuals, uh, brought the clients, he put them in the zone of danger. He did that by creating, by intentionally stealing from his, uh, from the expense cookie bar. Uh, he blamed it on or attributed it to work done for, uh, clients, a client fund, which was not true, but for his doing that, he would not, the funds would not have been exposed. And it became reasonably foreseeable because under capital gains, he failed to engage in any. And again, here, I'm using the words of capital gains, uh, reasonable investigation or reasonable attempt to avoid misleading his clients. He did nothing. As the district court said, he had utter indifference. He did, he didn't, he took no step whatsoever to even look at those. Tell me how, tell me what, what the possible trigger for that investigation that Paul Weiss eventually, uh, uncovered was, was, was there for Rashid in Was there any, any indicator, any red flag that came to his attention that, that, that would have, would have, um, uh, were caused him to, to, to question Apollo's normal practices, which was not to do that. Um, so my understanding your honor, and I, and I may not be fully understanding the question is that Paul Weiss was hired initially by Apollo, um, as part of, I believe Apollo was going public at the time that the Apollo company was going public at the time. I, um, and they were just sort of doing part of their due diligence to make sure that their accounting process was working. And then in the course of that, um, further, the, the only individual that, uh, Paul Weiss, and this is in the record, um, found that had problematic issues with respect to the, with respect to their expense process, Paul Weiss discovered was Mr. Rashid. And then from there, uh, Paul Weiss was, uh, further retained. Um, and they hired as I believe the Bolton consulting group or, or, uh, an auditing firm, uh, to drill down on what Rashid had been up to that led to a meeting in July of 2013, where there was, uh, a discussion about the volume of Mr. Rashid. Um, I'm talking about Rashid's problem. Rashid cheated Apollo. There's no question about that. And there's no question about it cost him his job. There's no question about the fact that he was forced to pay it back plus the cost of investigation and, um, and so forth. The, the, the question I have is what, what would have alerted Rashid or anyone to the, um, fraud that was being committed by the, uh, by, by the accounts receivable department. Your honor, with all due respect, I think that for a fiduciary that is the highest guardian that the law imposes essentially in the financial sector, it put that flips it on its head. Rashid had no basis, not to believe that the funds were being voiced. He had some obligation and the words of capital gains to do something, to try to understand, as you said, your honor, had he done that, had he found those limited liability agreements, had he pointed to them, which he did none of that, um, we might have a different case, but the question is, did he, did he violate his fiduciary? He didn't do anything, your honor. He just assumed it was all going to be okay. And as the district court, he didn't care who paid. It seems to me what you're saying. And I think what judge Castell is saying that if you are going to engage in a long-term fraud on your employer, falsely, uh, reciting the expenses, uh, of the work you're doing on funds, then as a fiduciary, you better make sure that that fraud is not seeping into, uh, the management of the funds, uh, because you're a fiduciary. I'm just solving. You have you absolutely perfectly. I wish I had put it as well as you did. Absolutely. Correct. That is what we are saying. That is, that is our view. And again, that goes back to standard hearing. What's the authority for that? Uh, capital gains, and the articulation of the three standards, uh, the three principal, uh, components of the fiduciary obligation. The third of which is the first of which is a second, a third of which is employing reasonable efforts to avoid materially misleading your funds. The first of which is acting in good faith towards your fund. And remember, um, if this isn't just a failure to and intentionally attributing, uh, his personal expenses to the fund as, as phony work expenses. So he did that. He didn't just, this isn't a guy who was innocent and just submitted a bunch of expenses. He decided to cover that up, to hide that by attributing them to the fund. He exposed the funds to the danger and he did so with no reasonable basis for believing that the funds wouldn't be invoiced. And again, I go back to his own expert at page eight 64. If I may pivot, um, just for a second to materiality. Um, I want to, I may have had a question. No, go ahead. Uh, materiality. I want to point out, um, uh, uh, pardon me for a second. I want to correct one thing I said, by the way, I gave the wrong citation for, um, Rashid's expert. That's actually, uh, the commission's a special appendix page eight 21. And, uh, again, my apologies. I was looking a little bit ahead of the phone number. Uh, now I wanted to go to page eight 64 of the appendix. However, uh, that's the pretrial hearing where the district court asked, um, the commission and it subsequently goes on as, as, uh, Mr. Rashid's counsel has pointed out past the defendant, uh, ask Rashid's counsel, uh, is materiality required here? The district court's pre-trial hearing asked that question. Commission says, yes. The immediately again, on page eight 64, the court says, okay, okay. But do we really need to prove up hundreds of these? Isn't it enough to demonstrate this by proving up 20 instances of false claims of personal expenses? This is literally here. And the commission says, yeah, you know, 20 instances is probably enough. That's exactly what happened here. Exactly. Although it was 32 instances that the commission decided to pare its case down, prove 32 instances. It's very clear that, um, the court made the requisite standing that Rashid engaged in a practice or transactions that defrauded the client. That's what's, that's the standard that's required. Didn't need to break it out. And it's clear that the district court, uh, from the pretrial hearing had, uh, was thinking about the issue very clearly and was aware of the issue. And then if I may interrupt you, I mean, where in the judge's opinion does he make a finding of materiality? Your honor, he does not make an express finding of materiality in those words where he breaks it out. Um, and says materiality has been found here. Um, but as the appellant says, your honor, this court, even if this court thinks that it's, it's not obvious on the face of the decision, as the appellant says, this court can find it themselves, can find materiality. And I, to go back to judge Walker's point here on materiality, it's inconceivable that someone who is a fiduciary, who you are entrusting to give you the best advice, uh, and entrusting to act with as capital gains against a high ethical professional standards. Um, it's inconceivable that that would not be important to anyone who was taking advice or looking to someone as a fiduciary. But you're relying on the, the number of false expense reports, as opposed to the dollars. Is that what you're saying? Uh, one step in between I'm, I'm relying on the fact that the district court, I think, and, and this court should rely on what those numbers of theft demonstrate about Rashid's personal business, excuse me, business integrity. And what, and that business lack of business integrity as demonstrated by those thefts. And that's the district courts were obsessed and the utter disregard he showed for whether or not his clients would be expensed. That is the antithesis, the antithesis of what capital gains talks about is required by law of a fiduciary. This is, uh, this was absolutely abusive conduct. This is not someone who should be in, uh, be a fiduciary. All right. Can I ask you a question about that? So if a lawyer steals from his clients, that's a big problem. That's a violation of disciplinary rules and they'll get disbarred. If a lawyer steals from his firm, that'll be a different disciplinary rule, but it's still likely to get them disbarred. Are there other rules that, uh, besides the investment advisors act that would, uh, result in the de-licensing of somebody who steals rampantly from their employer? Uh, yes. Uh, in the securities laws, uh, for instance, broker dealers, um, who engage in misconduct can be, uh, prohibited from. No, I'm not talking about broker dealers. I'm talking about an investment advisor who steals from his firm. Um, is that something that's beyond the reach of the SEC? Oh, uh, no. And that's, that's part of, uh, and it's just somewhat in the injunction briefing. That's part of a, a follow on proceeding that is now pending that is triggered only by, uh, the entry of a permanent injunction. And we discussed that sort of that's discussed, uh, in the, uh, uh, last part of the commission's brief, the last part of the appellant's brief. Um, and the commission has the authority once a permanent injunction is found to then engage in a separate independent proceeding, which ultimately is itself subject to a review by a court of appeal should appellant decide to do so, if they're not victorious, um, based on individual factors, uh, to determine whether, uh, given the conduct of issue and the likelihood of reoccurrence, um, the individual has demonstrated a lack of capacity to, uh, operate, um, as an investment advisor. But you're saying that you're saying that that's contingent on the finding of liability by the district court, right? Yeah. Okay. So if the district court found for Rasheed and said, look, he's a crook through and through. Um, but he was only a crook against his own firm. And, uh, so I'm not going to find him liable. Then the SEC is powerless to, uh, discipline or, uh, or do you license? The SEC initially made a choice, your honor, uh, instead of pursuing this case in our administrative forum, uh, the commission decided to go to the court of, uh, district court and pursue this in the judicial forum. The commission earlier on could have decided to proceed, uh, the agency venue in, in a formal adjudicatory process, but the commission decided to pursue this in the court of appeals. Can the court may be aware that there has been some litigation recently around. It's pretty clear why that happened, um, that you were going for a 206, uh, sub one, uh, uh, liability. Um, and that was where you put, put most of your attention. And of course that was what you forcefully argued to the, to the district court that was rejected, uh, that he S that he had knowledge, uh, and that he had C enter and failing that now you had to, you had to go back on to negligence. Uh, and that's what you're, that's what you're trying to argue now. And my concern here is that if we expand the duty on reasonable foreseeability in this area, what will we be doing basically to, um, the landscape of the law? Uh, won't we be, won't we be really changing things dramatically when it comes to, um, the duty to investigate here, here, nothing in the record suggested that Rashid's fraud should have made him more aware than the other executives of, of Apollo, uh, of the, of Apollo's charging practices. Um, and, um, I don't know of a case that really, uh, uh, imposes liability on advisors for failing uncover negligence, but they had absolutely no reason to suspect. Your honor. Um, first of all, I don't think that there's anything here that would be, uh, changing the, uh, negligence standard. The negligence standard is what's reasonably foreseeable to an actor based on the knowledge that actor has at the time that he or she asked the knowledge of Apollo's or, uh, some indication that Apollo was, uh, was defrauding the funds. Your honor, um, respectfully, uh, the reasonable foreseeability standard is what harm, uh, to the funds reasonably foreseeable. You don't have to know all the details, all the machinations. And here as, uh, uh, Rashid's expert said it was reasonably foreseeable based on the knowledge Rashid had. And the knowledge Rashid had was, uh, that he had no basis, uh, to not that the funds would be invoiced. And as Rashid's own expert said, it was reasonably foreseeable, uh, that the funds would be invoiced. Um, having brought that gets down to the point we were talking about earlier, he had no, you're saying he had no reasonable basis to believe that the funds would not be charged, but certainly if he was aware of the terms of the various agreements that were out there, uh, then he would have had a reasonable basis for believing that the funds weren't charged. But, um, because he didn't investigate that far, he's liable. Uh, if he'd investigated enough to get a reasonable basis for believing that the funds were not going to be charged, then, then, then, then he would have had no obligation. Your honor, I think that's generally correct. I don't want to go so far as to say he would have had a reason. He would have in a much better position. I will concede that it's, I think that's pretty indisputable, but, but your honor would provide a reasonable basis. I mean, I don't think we can really quibble over that. Uh, I don't want to get in trouble, uh, with folks here. So I, I will, I will, uh, I don't want to get in trouble with you, but I want to get in trouble with folks here. So I, I think it would be a stronger case that he would have. But, um, if I might, your honor, uh, I think it's important to just step back and look at the case just for a second. Okay. This, this is not a man who, who just, I had no idea they were engaged in misconduct. What happened here? And this is where I think the district court's a really thorough opinion, uh, is so helpful. Rashid lies at a whole bunch of levels first, right? He, he lies about billing his personal expenses. I mean, pretty gross lie, but, but, but to get to mask it, to get away with it, he hides it on the least likely to be found potential, which is invoices or excuse me. Um, he attributes it to work for his clients. Uh, he does all that potentially it's Rashid was just stepping back from your honor Rashid invites them. No, actually he doesn't bite them. He hauls them into the zone of danger. If Rashid had not made that second intentional decision, had he attributed to, uh, uh, business development, his personal, his phony personal expenses. Again, I think this would be a different case, but Rashid brings the funds into the zone of danger here. Again, I rely back on his, his own expert. And what does he do as a fiduciary having exposed them to the risk? What does he do? Uh, he doesn't bother to look as your honor said at the limited liability agreements. He doesn't bother as I think maybe it was judge Sullivan earlier, earlier may have said, doesn't bother to try as a, as a senior official, somewhat senior official at Apollo to understand the expense practices. He, in the words of the district court shows having brought them in the zone of danger, utter disregard to who pays as long as, as the district courts, as the district court says, as long as Rashid doesn't pay, he doesn't care. Um, and this, this your honor is the heart of the negligence claim. Okay. Well, I have one other point here, a question that I want to raise. Uh, I think the, I don't think it's any secret that the sec is objective here is to, is to bar him from being continuing as an investment advisor, correct? I mean, that's, that's objective. Can I pause there just for a second, your honor? And I don't want to appear to be cute on this, but it is this court's teaching. It is the teachings of the DC circuit and the commission takes it very seriously that there must be an independent proceeding based on independent, uh, important, the, the, the five Stedman factors and any other relevant considerations, uh, under the statute, it is not an automatic proceeding. The commission is pursuing that the commissioners themselves have to sit as independent arbiters of that. So I do not want to say, I don't want to be in the position of saying it's the commission, you know, because then that would suggest some kind of prejudgment, which absolutely does not come into this with that, but it's, it's, it's, it's, it's, it's, it's a first step. Let's put it that way. Maybe an indispensable step towards the commission considering the possibility that he should be barred. Is that right? Right. And your honor, that is exact. Yes. And that is exactly what, uh, the investment advisors act. That's what Congress contemplated. So that's not you know, I'm not quarreling with any of that. Uh, I'm just wondering whether that was a factor that should have been brought to the district judge's attention when the district judge was fashioning a remedy here, your honor. That's, that's a great point. I'm glad you raised it. Um, sec versus Manor nursing home, uh, in 1972, um, it's cited in the brief. And I think it's, uh, a great case because it, it really sort of starts to, to really unpack, uh, what happened here. Um, there's a court says the action, I'm going to quote it. The critical question is, uh, reasonable likelihood of reoccurrence pausing there for a second where she doesn't dispute anywhere in his briefs that there's a reasonable likelihood of reoccurrence. Okay. Uh, Manor nursing home then goes on to say true. A court should consider other relevant, equitable considerations. Now there, I want to pause for another second where she didn't raise any potential harm to him. And it was discussed with Rashid council outside of settlement discussions, contrary to what they say in their brief. It was, um, Rashid's council was fully aware. This is why, um, but at the end of the day, uh, Manor nursing home goes on to really set the, the critical balance, your honor. And the critical balances is that the public interest must give way to personal harms. And here you have an individual who has not disputed the reason that there's a reasonable likelihood of reoccurrence. How could he, he's twice been caught and continued. He was twice caught by Apollo and continued, continued on, uh, doing this. Um, so there's no dispute about that to the extent that they're complaining about harms. They waived it. They never raised it. Not one single sentence in their brief. They agreed. They, they agreed that reasonable likelihood of success. I, I recommend to the court, they pulled the post-trial brief. Uh, they agreed with us. It's all reasonable likelihood of success. Um, and at the end of the day, Manor nursing home says where you've got reasonable likelihood of success, notwithstanding success or reoccurrence in the public interest, reasonable likelihood of success or reasonable likelihood of reoccurrence. Your honor. I apologize. I'm mixing my you're absolutely right. I strike what I said. Reasonable likelihood of success. I mean, reasonable, uh, likelihood of occurrence. That is what, uh, they do not dispute. That is what the district court found. That is what both parties agreed was the only issue here. That's what was briefed and argued to the court. Um, there was nothing ever raised about harm to Rashid, uh, a potential contingency that he might be subject to a follow on proceeding and that that follow on proceeding might yield a bar. There are any number of remedies that, uh, the commission or release that the commission could impose there. And that, you know, is ultimately subject to an entirely different judicial, uh, avenue of appeal and consideration. This conversation, this conversation has raised another question in my mind, and that is you're, you're pointing out that it's ultimately, if he's, if he's to be, uh, barred from continuing as an, as an investment advisor, forever barred, uh, that's a commission decision, correct? That's, that's a commission decision. Why is this, uh, uh, why is this case, uh, this case, obviously, if it, if it turns out, if, if, if, if there's an affirmance would, would, would support the sec in this, but why isn't the case against Rashid strong enough to present to the commission independently of this particular litigation for, for your honor? We cite, we cite in the last, and I, I can, uh, I apologize. I of our brief, uh, the statutory screen, actually statutory scheme that Congress created. Um, I suspect there are many people at the commission would love it to be the way that you suggested, but the way that Congress, uh, has structured it is that there has to be an enforcement proceeding. The enforcement proceeding yield, uh, produces a permanent injunction for a violation and that that is the trigger for the follow on administrative proceeding for the bar. So it is that permanent injunction. And it's all discussed in the last two or three paragraphs of the commission's, uh, red brief, the, uh, the response brief. So it's all laid out in there, your honor. And, uh, it's the answer is Congress and the structure of the investment advisors act. Why wasn't there enough to support a referral to the U S attorney's office or to a district attorney? I mean, people go to jail for a lot less than this. I mean, I'm just sort of wondering what anybody who's gone to jail for stealing mail is thinking about somebody who has stealed hundreds of thousands, stolen hundreds of thousands of dollars from his employer. Your honor, I apologize. I don't have the answer to that. And that would also be an eternal deliberative process material that I probably wouldn't even be permitted to share if I did know, but your honor, I think your honor makes a great point for the same reason that, it, it, it would be something that, or that is something that people go to jail is that's the reason that it's an important to any, uh, fund, um, any client fund under the investment advisors act. That's looking to someone for investment advisory advice, someone who is a fiduciary under law, the highest, uh, a guardian of the fund. All right. Well, we've kept you way over. We've made Ms. Halligan look like she got short change. She only got 10 or 12 minutes. So Ms. Halligan, you've got, uh, two minutes for rebuttal. We'll see how close we stick to that. Thank you. Your four points. If I may briefly make them first of all, um, in response to our exchange earlier, judge Sullivan page eight note two, uh, of our opening brief describes Mr. Rashid's duties as a partner. He was not a manager of, of the funds. Um, secondly, with respect to, uh, my adversary's invocation of testimony, I believe he is referring to, uh, Mr. O'Connor. I have to say that is misleading and really out of context. I think if you look at the excerpt, which I believe he is referring to, um, what that expert is talking about is whether the funds would care about Apollo's policies and whether Apollo should have engaged in some extra level of review, not suggesting that any expenses being passed through, uh, with respect to Mr. Rashid, uh, would I just ask you what, what are you referring to? What is the appendix page? I believe that what, uh, uh, Mr. Sherry was referring to is testimony, uh, uh, from, uh, Mr. O'Connor in the appendix. Let me get the page site for you. I believe 821. Yeah, I didn't see it. So I think, I think he may be referring to page, uh, a 86 in the secs appendix, but in any event, the point is, and I think this is addressed in the briefing, um, that I think that that is, is taken out of context and certainly is not an admission of materiality by Mr. Rashid. Um, third judge Sullivan in response to, uh, your exchange with Mr. Sherry, of course, the district court did not find materiality, nor did it grapple with these arguments, which were made and they're set forth in the appendix. And so obviously what the court is, what the sec is asking this circuit to do is to fill in, uh, on materiality and make that finding, which is what would make new law. And finally, uh, to the question about, uh, the duty to investigate, uh, judge Walker, as you suggested in exchange with Mr. Sherry, if Mr. Rashid had pulled up the LPAs, the, the limited partnership agreements with the investors and the employee policies, which he did testify, he had a general understanding of it would have led him to the same conclusion. All that Mr. Sherry has done. And he used these words specifically is to argue that there was, but for causation here, he has not explained how the intervening acts of Apollo, which Apollo's own expense manager testified was who made the decision to pass these, these expenses along, how there could still be any proximate cause here and why that decision doesn't disrupt that chain of causation, just like in any other negligence analysis with respect to capital gains, which Mr. Sherry also points you to the holding of that case is that section 206 is intended to make sure that advisors don't give biased advice. It certainly does not say that any misconduct, which indicates a lack of integrity is disqualifying and, and Leo leads to liability. Finally, uh, judge Walker, you said, and I think, uh, uh, judge Sullivan, you were getting at this as well, um, that Mr. Rashid, you said judge Walker that he cheated Apollo. This is an employment dispute between Apollo and Mr. Rashid. He is not here making excuses for his conduct vis-a-vis Apollo, but he resolved that dispute. He repaid those expenses and he lost his job. It is not something that is cognizable under the investment advisors act and finding that there is a duty here would open the door to tremendous uncertainty and litigation. So we ask that the court reverse and conclude that Mr. Rashid cannot be found liable on this record under 2062. Thank you. You're suggesting it would be a bad thing if, uh, investment advisors were not able to cheat their lawyers going forward. Uh, your honor, that, that is it with respect. That is not what, what I am saying. What I am saying is two things. First of all, that a finding of materiality in the face of two points, first of all, undisputedly the smallest amount compared with any case we have found, which suggests that 2% or less is, is immaterial as a matter of law. And secondly, the fact that he did not know and the district court found, and the district court clearly looked very closely and critically at Mr. Rashid's conduct. The district court found the SEC didn't prove he know that's why they lost the 2061 case. So your honor, I am saying that that does not make out a 2062 violation. It did give rise to the actions that Apollo took against Mr. Rashid. And I am not quarreling with that, but that, that is not cognizable under 2062, your honor. Thank you, your honor. No, thank you both. Uh, we certainly got, got our money's worth, uh, well argued, well breathed. We will reserve decision, not surprisingly, and we'll move now.